SC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Benton Gene Baskin, | No.  CV 21-01890-PHX-SPL (JFM) |
| Plaintiff, | |
| v. | **ORDER** |
| Todd Thomas, et al., | |
| Defendants. | |

On November 8, 2021, Plaintiff Benton Gene Baskin, a Kansas prisoner who then-appeared to be confined in the Saguaro Correctional Center (SCC) in Eloy, Arizona, filed a pro se civil rights Complaint pursuant to 42 U.S.C. § 1983, an Application to Proceed In Forma Pauperis (Doc. 2), and a motion to appoint counsel (Doc. 3).  The same day, a notice of assignment was docketed and mailed to Plaintiff at SCC, which appeared as his address of record (Doc. 4) on his Complaint.  On November 18, 2021, the copy of the notice of assignment mailed to Plaintiff was returned as undeliverable (Doc. 5).  In a December 15, 2021 Order, the Court denied the deficient Application to Proceed and gave Plaintiff 30 days to pay the filing and administrative fees or file a complete Application to Proceed In Forma Pauperis (Doc. 6).[1]  Copies of that Order mailed to Plaintiff at the SCC address were returned as undeliverable (Doc. 7).  After Plaintiff failed to either pay the filing and administrative fees or file a properly completed Application to Proceed In Forma Pauperis, the Clerk of Court entered Judgment of dismissal (Doc. 8).  A copy of the Judgment sent

---

[1]  The Court also denied the motion to appoint counsel.

**TERMPSREF**

to Plaintiff at SCC was returned as undeliverable (Doc. 9).

On August 4, 2022, Plaintiff sent a letter to the Court (Doc. 10) that listed a return address at the Hutchinson Correctional Facility (HCF) in Hutchinson, Kansas.  In the letter, Plaintiff stated that he "evidenced his new address" on November 1, 2021, but never received an acknowledgment.  Plaintiff claimed that the return address on the letter was "and always has been" his up-to-date address.  However, the return address on his Complaint was for SCC not HCF, and the SCC address was entered on the docket.  (Doc. 1 at 1.)  Nevertheless, because HCF was listed as the return address on the envelope in which Plaintiff mailed his Complaint and an October 21, 2021 letter addressed to the Clerk of Court, the Court vacated entry of Judgment and reopened this case.  Plaintiff then paid the filing and administrative fees (Doc. 13).  The Court will order Defendants Giaboian, Diaz, and Westbrook to answer Plaintiff's threat-to-safety claim (Count II) of the Complaint and will dismiss the remaining claims and Defendants without prejudice.

**I.      Statutory Screening of Prisoner Complaints**

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*,

TERMPSREF

550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct.  *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally."  *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010).  A "complaint [filed by a pro se prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'"  *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## II.     Complaint

In his three-count Complaint, Plaintiff alleges claims for denial of constitutionally adequate medical care, threat to safety, and Eighth Amendment deliberate indifference. Plaintiff sues the following employees of SCC: Warden Todd Thomas, Licensed Practical Nurse (LPN) Gerald Walker, and Registered Nurse (RN) Marci Gottfredson.  Plaintiff also sues Supervisor Westbrook, who worked for TransCorporation of America (TCA) at relevant times.  He further sues HCF Warden Daniel Schnurr; HCF Special Operations Response Team (SORT) Lieutenant Giaboian, and Sergeant Diaz.  Plaintiff seeks declaratory, injunctive, and compensatory relief.[2]

Plaintiff alleges the following facts:

At 3:00 a.m. on October 23, 2019, Plaintiff was escorted from his Kansas cell for processing prior to being transported to Salina, Kansas, and eventually to SCC pursuant to an Interstate Corrections Compact.  Defendant Westbrook supervised Plaintiff's transport from Kansas to SCC.  Defendant Giaboian applied wrist, waist, and leg restraints.  Plaintiff

---

[2] Plaintiff's claims for injunctive relief are moot because he is no longer in SCC custody.

TERMPSREF

has a "slim waist and thick stomach area," and he asked Giaboian to loosen the slack so that he could consume his sack meal.  Giaboian ordered Plaintiff to hold his arms level with his waist and applied waist, wrist, and ankle restraints.  Plaintiff asked Giaboian to loosen the wrist and waist restraints because he had difficulty raising his arms high enough for Giaboian to secure the restraints.  Giaboian unsuccessfully attempted to place a finger between Plaintiff's wrists and the restraints.  Plaintiff asked Giaboian to loosen them because they were too tight, noting that Giaboian had been unable to get a finger between them and that his hands were bigger than his wrists.  Giaboian responded the cuffs were "not built for comfort" and ordered Plaintiff to board a transport vehicle.

After boarding and being seated in the transport vehicle, Plaintiff asked Defendant Diaz to loosen the restraints because they were cutting into his arms and wrists.  Diaz asked Plaintiff why he had not asked Giaboian.  Plaintiff responded that he had but Giaboian had refused.  Diaz made no further response.  About five minutes later, Diaz and an unknown SORT officer left the transport vehicle, and then reboarded 15-20 minutes later.  They brought a milk crate and cooler containing sack lunches for later distribution.  Plaintiff again asked Diaz to loosen his wrist restraints, but Diaz did not respond.  Plaintiff then asked how he was supposed to eat his meal when he could not lift his hands to his mouth, but Diaz did not respond.

Plaintiff and another prisoner, Bemis, noticed that Plaintiff's arm had become swollen "enormously" and the cuff on Plaintiff's right wrist had begun cutting into the wrist.  In obvious pain, Plaintiff again implored Diaz to adjust his wrist restraints.  Diaz told Plaintiff "Be patient, we have a short ride ahead of us, we will get you taken care of then."  (*Id.* ¶ 24.)  Plaintiff was forced to endure the 90-minute trip in pain, while the transport vehicle went to El Dorado Correctional Facility (EDCF) to pick up more prisoners.

When the vehicle arrived at EDCF, at about 4:30 a.m., Diaz and the unknown SORT officer checked their weapons at the security tower.  Plaintiff "irritably" complained to both about his swollen wrists and pain, but both ignored his request to loosen the cuffs.

TERMPSREF

(*Id.* ¶ 26.)  After passing the inspection point, Diaz drove the transport vehicle into the sally port and docked it.  After waiting 15-20 minutes, the prisoners exited from the vehicle and entered EDCF.  Once inside the building, which was lighted, Plaintiff and other prisoners could see how swollen Plaintiff's arms and wrists were.  Plaintiff spoke through the crack of the holding cell door in an attempt to get the attention of SORT officers, without success, and another 15-20 minutes passed.

Plaintiff then spotted HCF SORT Officer Reau, who signaled for the holding cell door to be opened and directed Plaintiff to a seating area, where Reau tried to remove the wrist restraints to adjust them.  After some difficulty, Reau was able to remove the restraints and saw the swelling and redness of Plaintiff's wrists and arms.  After experiencing difficulty re-applying the restraints, Reau concluded the restraints were too small.  Reau successfully re-applied the wrist restraints and waist restraints, but Reau again said the restraints were too small and appealed to EDCF SORT officers telling them that Plaintiff needed bigger handcuffs and described the state of Plaintiff's arms and wrists.  Plaintiff was briefly returned to the holding cell, then an EDCF officer took Plaintiff to the nurse's station where Plaintiff's vital signs were taken.  The medical provider asked Plaintiff if he was taking blood pressure medication because his blood pressure was "extremely high" and asked Plaintiff if he was "okay."  (*Id.* ¶ 33.)  Plaintiff responded negatively and said that he was having an anxiety attack due to the restriction of blood flow to his arms, wrists, and hands.

Plaintiff asked the provider and EDCF officers to assist him in being fitted with larger hand cuffs, but they "deflected" responsibility to Defendant Diaz and said there was nothing that they could do about the swelling or the cuffs cutting into Plaintiff's wrists and arms.  (*Id.* ¶ 34.)  They escorted Plaintiff back to the holding cell.[3]

At about 6:00 a.m., the prisoners, Defendant Diaz, and the unknown SORT officer departed from EDCF.  Plaintiff again asked them to adjust his waist and cuffs because of

---

[3]  Although Plaintiff claims that the "Corizon Medical Provider, EDCF Officers, Defendant Diaz, and unknown [SORT] officer" were deliberately indifferent to his pain, Plaintiff only sues Defendant Diaz.

1   the swelling of his arms and wrists.  Plaintiff asked how long until they reached the Salina
2   airport.  They turned up the radio and heater and ignored Plaintiff.

3         Plaintiff and the other prisoners arrived at the Salina airport at about 8:00 a.m.
4   Plaintiff again pointed out the effects of his tight restraints and again asked Diaz how he
5   was supposed to eat meals when he could not reach his mouth.  Diaz again ignored Plaintiff.

6         After about 30 minutes, two unknown men boarded the transport vehicle and
7   identified themselves as TCA employees.   The supervisor identified himself as Mr.
8   Westbrook.  Plaintiff informed Defendant Westbrook about the tight restraints causing
9   swelling of his arms and wrists.  Defendant Westbrook responded that as soon as the plane
10  was ready for boarding, his employees would make necessary adjustments to each
11  prisoner's wrist restraints.  Plaintiff had to wait at least another 90 minutes, while other
12  transport vehicles arrived.  Plaintiff asked Westbrook if he could bring his sack meal aboard
13  the plane, but Westbrook said no.  Non-party TCA employee Payne opened some of the
14  items in the sack meal and helped Plaintiff to eat them.  The remainder was discarded.

15        Before exiting the transport vehicle, Plaintiff was chained to prisoners Bemis and
16  Moore.  While being chained to them, Plaintiff asked the TCA staff to check how tight his
17  wrist restraints were and to adjust them.   An unknown TCA officer said that someone
18  would take care of him after he was on the plane.  Defendant Westbrook also reassured
19  Plaintiff that the restraints would be adjusted on the plane.  After being seated on the plane
20  at approximately 9:00 a.m., Plaintiff complained to TCA staff about his pain and swelling
21  from the restraints, but they ignored him.

22        At about 11:30 a.m., Defendant Westbrook advised everyone to secure their
23  seatbelts.  As the plane readied for take-off, Westbrook announced that he and his staff
24  would begin adjusting the prisoners' restraints that were too tight.  TCA employees began
25  adjusting restraints from the front of the plane.  As Westbrook walked down the aisle
26  towards where Plaintiff was sitting, Plaintiff pointed out the swelling to his arms and the
27  cuffs cutting his wrists.  Westbrook told Plaintiff that if he asked Westbrook one more time
28  about his restraints, Westbrook would leave them as they were.

**TERMPSREF**

At some point, a TCA employee told Plaintiff, Bemis, and Moore to unfasten their seat belts and step into the aisle so that he could access their restraints.  The employee saw the injuries to Plaintiff's wrists and "extreme swelling" of Plaintiff's arms and told Westbrook that he needed some "Big-Boy Cuffs" for Plaintiff.  Westbrook responded that he did not have any on him, and the employee stated there were some up front.  Westbrook told the employee to remove the wrist restraints and then re-apply them with just one click.  The employee did so but saw that it did not resolve Plaintiff's issues.  The employee reapplied the waist and wrist restraints on Plaintiff, while telling him that he would get larger cuffs from up front as soon as Westbrook authorized him to do so.  Plaintiff asked the employee to at least place the waist chain above his stomach, which would allow him to eat the sack lunch that was being provided, and the employee did so.  Plaintiff, Bemis, and Moore were rechained and sat back down.

Plaintiff, still in pain, nevertheless fell asleep.  When he awoke, Prisoner McCaslin raised his arms to show Plaintiff that he had exchanged his restraints for plastic zip ties and told Plaintiff to make them change his.  After spotting the unknown TCA employee, Plaintiff asked to either receive larger steel cuffs or plastic zip ties.  The employee apologized but said they had given them all out.  Plaintiff continued to suffer pain throughout the plane trip.

After the plane landed in Arizona, the prisoners, including Plaintiff, waited on the plane for 90 minutes before they were loaded onto transport vehicles.  Plaintiff again complained to Defendant Westbrook and the unknown TCA officer and Westbrook told Plaintiff they would be removed after he arrived at SCC.  A TCA nurse told Plaintiff to be patient and warned him not to act up because of possible retaliation from by staff.  About 90 minutes later, Plaintiff arrived at SCC, where he continued to be cuffed for another hour until he had passed through security checks, when the restraints were finally removed.

Following a strip search, Plaintiff pointed out his swollen arms and wrist injuries, including blisters and cuts, to Defendant Thomas.  Thomas voiced empathy and told Plaintiff he would take care of the situation.  Thomas directed Plaintiff to medical staff for

care once Plaintiff was scanned and passed through check points.  Plaintiff was seen by CoreCivic Health Services Nurse Alexander.  Alexander refused to treat Plaintiff's cuts and blisters and told him to submit a 13-80A3 sick call request after he was assigned to housing.

Following Plaintiff's assignment to housing, Lieutenant Perez photographed Plaintiff's injuries and said that he was willing to provide copies of the photographs to Plaintiff.  Overnight, Plaintiff's exposed injuries stuck to his bedding.  Plaintiff notified unidentified SCC staff, who told Plaintiff there was nothing they could do until orientation was over.  On October 27, 2019, Plaintiff gave a sick call request to an unidentified SCC staff member, who "allegedly" turned it in.  (*Id.* ¶ 65.)

At orientation, someone directed Plaintiff to report to the CoreCivic Health Services Clinic.  There, Defendant Walker checked Plaintiff's vital signs.  Plaintiff asked Walker to treat his cuts and swollen arms.  Walker responded that there was nothing he could do but allow the cuts to heal.  Plaintiff asked for antibiotic ointment, gauze, and/or band aids, but Walker denied the request.

Plaintiff submitted another sick call request on November 1, 2019, after receiving no response to his October 27, 2019 request.  Plaintiff did not receive a pass to go to medical until November 15, 2019, when he was seen by Defendant Gottfredson, who told Plaintiff it was too late to treat his injuries and refused to give Plaintiff her name.  Plaintiff submitted an Inmate Request Form to CoreCivic Health Services Administrator Barajas seeking Defendant Gottfredson's name and title, and documentation of his injuries. Barajas apparently provided Plaintiff with Gottfredson's name and position as a registered nurse, and on December 6, 2019, Plaintiff was provided a diagram of his injuries.

On January 7, 2020, Plaintiff submitted an Inmate Request to Lieutenant Perez requesting color photos of his injuries.

Plaintiff describes his efforts to exhaust administrative remedies, including repeatedly seeking a response to his grievance from Defendants Thomas and Schnurr.  The last time Plaintiff approached Thomas about the issue, Thomas warned Plaintiff that he

would charge him with hindering staff and place him in segregation if Plaintiff asked about the issue again.  Specifically, Plaintiff claims that when he approached Thomas, Thomas told Plaintiff that he had already replied to the grievance, that Plaintiff should have received a copy, that he had addressed the situation concerning the failure to loosen the cuffs, and that Plaintiff was seemingly unable to resist asking about his grievance.  Thomas further said,

> "I'll tell you what Mr. Baskin, the next time you ask me about that Grievance, I'm going to put you in Segregation, and write your ass up for Hindering, But you know what Mr. Baskin, consider yourself lucky that it's almost New Years, Happy New Year!, and don't ask me about that grievance anymore."

(Doc. 1 ¶ 85.)

Plaintiff designates **Count I** as a claim for denial of constitutionally adequate medical care, presumably during his transport to SCC and following arrival at SCC.

Plaintiff designates **Count II** as a claim for violation of his Eighth Amendment rights, which the Court construes as a claim for threat to safety or failure to protect.

Plaintiff designates **Count III** as an Eighth Amendment claim for deliberate indifference, citing his allegations concerning exhaustion.

**III.    Failure to State a Claim**

To prevail in a § 1983 claim, a plaintiff must show that (1) acts by the defendants (2) under color of state law (3) deprived him of federal rights, privileges or immunities and (4) caused him damage.  *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005) (quoting *Shoshone-Bannock Tribes v. Idaho Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994)).  In addition, a plaintiff must allege that he suffered a specific injury as a result of the conduct of a particular defendant and he must allege an affirmative link between the injury and the conduct of that defendant.  *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

To state a claim against a defendant, "[a] plaintiff must allege facts, not simply conclusions [to] show that an individual was personally involved in the deprivation of his

TERMPSREF

civil rights." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).  For an individual to be liable in his or her official capacity, a plaintiff must allege injuries resulting from a policy, practice, or custom of the agency over which that individual has final policy-making authority.  *See Cortez v. County of Los Angeles*, 294 F.3d 1186, 1188 (9th Cir. 2002).  There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).  "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.

## A.    Defendants Schnurr and Thomas

Plaintiff sues HCF Warden Schnurr and SCC Warden Thomas.  Plaintiff alleges that both impeded his efforts to administratively exhaust his grievances in retaliation for seeking redress via the administrative remedy process.

To the extent that Plaintiff seeks relief for these Defendants' alleged failures to comply with prison grievance procedures, Plaintiff fails to state a claim.  The alleged failure to comply with prison regulations or procedures, absent more, fails to state a claim because violation of prison policy is not tantamount to a constitutional violation.  *See Cousins v. Lockyer*, 568 F.3d 1063, 1070 (9th Cir. 2009).  Further, "[t]here is no legitimate claim of entitlement to a [prison] grievance procedure."  *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).  However, if there is an established grievance procedure, the denial of *access* to the grievance process *may* state a constitutional violation.  *Bradley v. Hall*, 64 F.3d 1276, 1279 (9th Cir. 1995), *abrogated on other grounds by Shaw v. Murphy*, 532 U.S. 223 (2001); *Valandingham v. Bojorquez*, 866 F.2d 1135, 1138 (9th Cir. 1989).  The "government" to which the First Amendment guarantees a right to petition for redress of grievances includes prison authorities.  *Hall*, 64 F.3d at 1279 (citing *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989)).  It does not, however, entitle a prisoner

TERMPSREF

to a particular resolution of a grievance.  Plaintiff fails to allege facts to support that he was denied access to the grievance process, and therefore fails to state a claim on that basis.

Plaintiff also alleges that Defendants Thomas and Schnurr retaliated against him for using the grievance process.  A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal.  *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claim requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest").  The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff asserts that Schnurr retaliated against him by failing to respond to his grievance submitted via the Kansas Department of Corrections grievance process. However, he fails to allege facts to support that Schnurr intentionally failed to respond as retaliation for Plaintiff's submission of a grievance.   Thus, Plaintiff fails to state a retaliation claim against Schnurr.

With regard to Thomas's purported verbal threat, mere "'[v]erbal harassment or abuse . . . is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983.'" *Oltarzewski v. Ruggiero*, 830 F.2d 136, 139 (9th Cir. 1987) (quoting *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979)); *Patrick v. Martin*, 402 F. App'x 284, 285 (9th Cir. 2010) (holding that a sexual harassment claim based only on verbal harassment is insufficient to state a claim under § 1983); *cf. Somers v. Thurman*, 109 F.3d 614, 624 (9th Cir. 1997) ("To hold that gawking, pointing, and joking violates the prohibition against cruel and unusual

TERMPSREF

punishment would trivialize the objective component of the Eighth Amendment test and render it absurd.").

And while Thomas's threat might serve as evidence of a retaliatory motive, it does not support a retaliation claim absent an allegation that Thomas took adverse action against Plaintiff.  Standing alone, however, the threat itself does not rise to the level of retaliation.  Accordingly, Plaintiff fails to state a claim against Thomas for retaliation.

For the reasons discussed, Plaintiff fails to state a claim against Schnurr or Thomas and they will be dismissed.

**B.     Medical Care**

Plaintiff alleges that Defendants Walker and Gottfredson denied him constitutionally adequate medical care.  Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment.  To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs.  *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due

TERMPSREF

1    care for the prisoner's safety.  *Farmer*, 511 U.S. at 835.  "Neither negligence nor gross
2    negligence will constitute deliberate indifference."  *Clement v. Cal. Dep't of Corr.*, 220 F.
3    Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458,
4    460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice"
5    do not support a claim under § 1983).  "A difference of opinion does not amount to
6    deliberate indifference to [a plaintiff's] serious medical needs."  *Sanchez v. Vild*, 891 F.2d
7    240, 242 (9th Cir. 1989).  A mere delay in medical care, without more, is insufficient to
8    state a claim against prison officials for deliberate indifference.  *See Shapley v. Nev. Bd. of
9    State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985).  The indifference must be
10   substantial.  The action must rise to a level of "unnecessary and wanton infliction of pain."
11   *Estelle*, 429 U.S. at 105.

12          Plaintiff appears to assert that Walker denied him constitutionally adequate medical
13   care for cuts to his arms and wrists that he suffered after being tightly restrained during
14   travel from Kansas to Arizona.  Essentially, Plaintiff disagrees with Walker's denial of
15   antibiotic ointment and bandages for his cuts.  As noted above, mere disagreement with a
16   medical provider's determination regarding medically appropriate treatment, and the need
17   therefor, is not sufficient to support that Walker acted with deliberate indifference to a
18   serious medical need.  Plaintiff's medical care claim against Walker will therefore be
19   dismissed.

20          With regard to Gottfredson, Plaintiff alleges that when he was seen by this
21   Defendant on November 15, 2019, she told Plaintiff that it was "too late" to treat his
22   injuries, presumably because they had healed.  However, Plaintiff does not allege facts to
23   support that the injuries he suffered when he was transferred from Kansas rose to the level
24   of a serious medical need.  Moreover, as noted above, Plaintiff's disagreement with
25   Gottfredson's determination that there was nothing to be done, absent more, is insufficient
26   to support that she acted with deliberate indifference.  Accordingly, Plaintiff fails to state
27   a claim against Gottfredson, and she will be dismissed.

28   . . . .

TERMPSREF

- 13 -

**IV.     Claim for Which an Answer Will Be Required**

Plaintiff sufficiently alleges facts to support that Defendants Giaboian, Diaz, and Westbrook acted with deliberate indifference to a threat to Plaintiff's safety by repeatedly failing to adjust Plaintiff's restraints, particularly the failure to adjust his wrist restraints for hours.  These Defendants will therefore be required to respond to Count II.

**V.     Warnings**

**A.     Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

**B.     Copies**

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate stating that a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit an additional copy of every filing for use by the Court.  *See* LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

**C.     Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

**IT IS ORDERED:**

(1)     Counts I and III are **dismissed** without prejudice.

(2)     Defendants Thomas, Walker, Gottfredson, and Schnurr are **dismissed** without prejudice.

(3)     Defendants Giaboian, Diaz, and Westbrook must answer Count II as set forth herein.

**TERMPSREF**

(4)     The Clerk of Court must send Plaintiff a service packet including the Complaint (Doc. 1), this Order, and both summons and request for waiver forms for Defendant Giaboian, Diaz, and Westbrook.

(5)     Plaintiff must complete and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(6)     If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Complaint on a Defendant within 90 days of the filing of the Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served.  Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(7)     The United States Marshal must retain the Summons, a copy of the Complaint, and a copy of this Order for future use.

(8)     The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this Order.

(9)     A Defendant who agrees to waive service of the Summons and Complaint must return the signed waiver forms to the United States Marshal, not the Plaintiff, **within 30 days of the date of the notice and request for waiver of service** pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of personal service.

(10)     The Marshal must immediately file signed waivers of service of the summons.  If a waiver of service of summons is returned as undeliverable or is not returned by a Defendant within 30 days from the date the request for waiver was sent by the Marshal, the Marshal must:

(a)     personally serve copies of the Summons, Complaint, and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil Procedure; and

TERMPSREF

(b)    within 10 days after personal service is effected, file the return of service for Defendant, along with evidence of the attempt to secure a waiver of service of the summons and of the costs subsequently incurred in effecting service upon Defendant.  The costs of service must be enumerated on the return of service form (USM-285) and must include the costs incurred by the Marshal for photocopying additional copies of the Summons, Complaint, or this Order and for preparing new process receipt and return forms (USM-285), if required.  Costs of service will be taxed against the personally served Defendant pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise ordered by the Court.

(11)    Defendants must answer the Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(12)    Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(13)    This matter is referred to Magistrate Judge James F. Metcalf pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

Dated this 3rd day of October, 2022.

Honorable Steven P. Logan
United States District Judge

TERMPSREF